JUDGE TUCKER.
This was an appeal from the Richmond Chancery Court.
A preliminary question submitted to the Court on the argument of this cause, depends upon the construction of the act of Assembly, (a) which declares, “that after answer filed, and no plea in abatement to the jurisdiction of the Court, no exception for want of jurisdiction shall afterwards be made; nor shall the High Court of Chancery, or any other Court, ever thereafter, delay or refuse justice, or reverse the proceedings for want of jurisdiction, except in cases of controversy respecting lands tying without the jurisdiction of such Court, and also of infants and femes covert.’’
The remarks of Judge Taylor, in the cases of Guerfant v. Eowler and Harris, (b) and again in the case of Harris v. *Thomas, (c) appear to me to be founded on sound reason, and are, I think, well supported by those of Judge Pendleton, in Pryor v. Adams,(d) and in Terrell v. Dick, (e) as well as by the rules of practice in Chancery, mentioned in Mitford’s Pleadings, 112, 117, 171, 176, 177, 181, 182. I, thetefore, am disposed to adopt the Chancellor’s interpretation, that the clause is tobe confined to those cases where the jurisdiction of a Court of Equity must be excepted to, by a plea in abatement, and not by demurrer.
The parties in this suit, having had some considerable disputes, on the 22d of September, 1796, entered into a compromise. The object of the bill seems to be to open the old controversy again, but without relinquishing the advantages he had already received from that compromise; but I am of opinion, this Court ought not to permit the matters, which it was the object of the compromise finally to adjust and settle, to be again opened. Of this opinion was Eord Hardwicke, in the case of Puller v. Ready, (f) in which he says, “There is nothing more mischievous than for this Court to decree a forfeiture after an agreement, in which, if there is any mistake, it is the mistake of all the parties to the arti-cíes, and no one is more under an imposition than the other. This Court is so far from assenting to set up the forfeiture again, that they would rather rejoice at the agreement, because it has absolutely tied up the hands of the Court from meddling .in the question:” and in the case of Hook v. Ross, (g) I understood this Court to be unanimously of the same opinion. The compromise in the present case, upon the face of it, appears to have been a perfectly fair one, both parties being fully apprised of every circumstance relative to the dispute between them. The complainant acquiesced in it, received 6001. on account of it, and, as he alleges in his bill, continued in a determination to receive Morris’s notes until March, 1797. Pollard informed him by letter of January 24, 1797, that he had procured one for the amount he had to pay, which he had directed to be forwarded by post, fearing the complainant’s son might have left Philadelphia. The note was ^tendered and refused the 25th of March. Prom the whole complexion of the transactions, as they appear in the record, Patterson was as well acquainted with the character and credit of Robert Morris, and his notes, or at least had the means of information concerning them, as fully in his power as Mr. Pollard. They were notorious objects of speculation, and the whole complexion of the original transaction shews it to have been a job of the same description ; for the surveyor, in answer to the question respecting the relative quality of the two 'tracts of 75,000 acres each, answers, “that upon that subject, he can say nothing material: for quality was not sought for in those surveys, in any instance ; nor did it appear to be a consideration with Mr. Patterson; and neither the survey of 150,000 acres, nor that of 75,000 acres, was said or supposed to be land fit for cultivation.” Suppose there had been no compromise, would this Court, as a Court of Equity, interfere to settle a controversy between parties engaged in such a business? I should suppose it would say to them, settle your disputes, as you can, between yourselves; this Court will not interfere in the division of your spoils. On these grounds, I think, we ought not to go back beyond the compromise; and there is no circumstance whatsoever, either in the answers, deposition's, or exhibits, which appears to me to warrant the idea, that there was any fraud or concealment on the part of Mr. Pollard, or any surprise on Patterson.
The deposition ofEauchlan M’Lean may, perhaps, be considered as proving some duplicity on the part of Mr. Pollard. There is no date fixed to the conversation between him and the witness. If it were before the compromise of September 22d, it must have had relation to the matters which that compromise put an end to. The witness who was, perhaps, then interested with Patterson, ought, if he thought that conversation of importance, to have communicated it to Patterson: whether he did or did not, does not appear. Pollard’s observation respecting the low price at which Morris’s notes could be got, does not appear *to *595 have shaken Mr. M’Eean’s opinion of them, for he asks Pollard’s opinion as to exchanging- the notes of Swann, which he seems to have had by him, for Morris’s. It was in answer to that inquiry that Pollard expressed his good opinion of Morris, (in which he probably was not singular,) and recommended the exchange to M’Eean. No time was limited within which Pollard was to procure Morris’s notes for the balance of 4,500 dollars. He writes Patterson that he had purchased them, just four months after the date of the compromise; and Patterson never announces his determination not to accept them, till March 25th, (two months after,) when actually presented to him. The depreciation to 6s. 8d. in the pound, in September, was probably not unknown to Patterson, for he was in Richmond, the theatre on which they were constantly exhibited to the view of all the world. It was a reasonable supposition that a paper, already so depreciated, would soon fall much lower; and, Where any man makes a contract under such circumstances, he must abide by the event, be that what it may. It ought not to pass unnoticed, that Mr'. Pollard, in his amended answer, states, that after the sale of the 75,000 acres, belonging to the plaintiff, as stated in his original answer, it was agreed to substitute in the place thereof other 75,000 acres, the property of Pollard, which agreement was dissolved by mutual consent, and that of September 22d, formed in its stead; that he has repeatedly offered to reinstate that agreement, and is now willing to convey to the plaintiff the said last mentioned tract of 75,000 acres, on his returning the money paid him by the defendant. This offer, in my opinion, was such a submission to the jurisdiction of the Court, upon this case, as the defendant could not afterwards retract ; and put it into the power of the Court to make such a decree, as a Court of Equity might well make, upon such a bill and answer; but which, in my judgment, it could no otherwise have made, without this concession, than by dismissing the plaintiff’s bill. Por, as was well observed at the bar, if the object of the bill was *not to have the contract of September 22d rescinded, it must be to compel a specific performance of that which had already been specifically performed, as far as depended upon the defendant; (of course the bill would not hold on that ground;) or to obtain damages for the nonperformance of it as soon as the plaintiff had a right to expect; which it is the peculiar province of a Court of Taw to afford, and which it is incompetent to a Court of Equity to assess.
The only decree then which it was competent for a Court of Equity to make, was, to direct the delivery of the note tendered to the plaintiff, (it being in possession of the Court,) and thereupon to dismiss his bill with costs. But when Mr. Pollard had submitted to convey to the plaintiff the 75,000 acres mentioned in his last answer, the Court, I conceive, ought to have adapted its decree to that offer, giving to the plaintiff the alternative of accepting it within a limited time; in which case, each party ought to have borne his own costs; or, if that part of the alternative were rejected, or, being accepted, should not be complied with, on the part of the plaintiff by the repayment of the money, then the second branch of the alternative, the acceptance of the note deposited in Court, might also have been permitted within a limited time; and, if that were rejected, then the bill should have stood dismissed with costs; and such, I conceive, is the decree which this Court ought now to make; leaving to the plaintiff, if so advised, to pursue his remedy at law, for any damages to which he may suppose himself entitled by the defendant’s delay in making the payment stipulated between them to be made in Morris’s notes, in case he shall reject the alternative thus offered; or in case Mr. Pollard shall have parted with the 75,000 acres of land, (which he offered in lieu of the other,) and shall thereby have disabled himself now to convey the same. For, as that offer was neither accepted by the plaintiff, nor made the foundation of the Chancellor’s decree, I conceive Mr. Pollard was at perfect liberty to dispose of the lands as he might think proper.
* JUDGE ROANE.
The question made in this case, upon the construction of the act of 1787, is very important, has often occurred in this Court, and ought now to be settled, although, perhaps, the case could well go off without it. This question, as it is contended to arise out of the circumstances in this cause, is, whether the omission to plead to the jurisdiction of the Court, gives a power to a Court of Equity to decree in favour of a plaintiff upon a case appearing upon the face of the bill to be merely a legal question.
There is no doubt but that the act concerning the Court of Chancery, in which this provision is found, contemplated, only, cases in equity. It is clear also that, whatever shades of difference may be found to exist in different adjudged cases on this subject, the partition line between the two jurisdictions is as firmly established by the successive decisions of Courts of Equity, as any point whatsoever. It is as well established that a Court of Chancery ought not to hold cognisance of a case which has no ingredient of equity in it, as in a case where the value of the thing in controversy is below the standard established by the act relating to the subject. The established positions, on each subject, should be alike respected by Courts, in forming a construction ; and neither should be considered as repealed, but by express words, or a clear and necessary implication. Where the consequence is to be, the prostration of the line of partition between the two jurisdictions, and the letting in all cases to the forum of the Court of Equity, those words, or that implication, should be extremely strong and clear.
Bearing these considerations in mind, let us consider the question before us. The words of the section are: “After answer filed, and no plea in abatement to the jurisdiction of the Court, no exception for want of jurisdiction shall ever afterwards be made, nor shall the Hig-h Court of Chancery, or any other Court, ever thereafter delay or refuse justice, or reverse the pro *596 ceedings for want of jurisdiction, except in case of controversy respecting lands *lying without the jurisdiction of such Court, and also of infants and femes covert. ” (a) The question is, whether the omission to plead in abatement to the jurisdiction of the Court, will extend to a case plainly appearing, upon the face of the bill, to be proper for the cognisance of a Court of Taw only, and not of any Court of Equity. In such case, the ground of de-fence being apparent on the face of the bill itself, the proper mode of defence is by demurrer, and not by plea.(b)
And again, we are told, more particularly, that where it appears by the bill that the subject of the suit is not within the jurisdiction of a Court of Equity, the proper mode of defence is by demurrer, (c) On the other hand, when the objection to the bill is not apparent on its face, the defendant, if he means to take advantage of it, ought to shew it by plea or answer. It is true that this writer, in stating the grounds of defence by plea, admits, inter alia, that a plea is proper, where “the subject of the suit is not within the jurisdiction of a Court of Equity ;”(d) but I presume that, in such case, that fact is to be made out aliunde, and not from the face of the bill itself; and a plea of this kind is also considered as a plea in bar, and not merely in abatement, (e) The question then is, whether the Legislature, in this section, contemplated any other case than those in which a plea in abatement, (or at least a plea,) was proper? Of which description of cases there are several, as, where the case is proper for a Court of Equitj', but not this particular Court; or where there is no objection to the case made by the bill, but yet the suit ought to be abated or barred by reason of some circumstance attending the situation of the plaintiff or defendant, or the like. Could the Legislature, when they used this particular expression, (plea in abatement to the jurisdiction of the Court,) have contemplated a case to which a demurrer (or, at most, a plea in bar) was the only proper defence? The other class of cases just alluded to, will satisfy the expressions of the act; and this construction is also supported by the exceptions in the clause, in relation to lands lying without the jurisdiction of the Court, and infants and *femes covert: these exceptions fall entirely within that class, in which pleas are proper; and the exception in this case proves the rule.
But it is said that the general words in the latter part of the clause, are so strong as to comprehend every thing. I answer, in the first place, that it is a sound rule of construction, that general words in a statute are to be expounded, by reference to the actual case in the contemplation of the Legislature, as evidenced by their words, which here was a ground of defence to which a plea in abatement, (or at least in bar,) and not a demurrer, was properly applicable ; 2d. That the Legislature is to be presumed conusant of the just rules and doctrines of pleading, and to know the extent and import of any technical terms used by them; and, 3d. That neither are the-words of the act, perhaps, more strong, nor the reasons in favour of a qualified construction less operative, than in other analogous cases in the law, where a restricted construction has been adopted. For example, in the act of jeofails, it is said that no judgment after verdict shall be arrested, ‘for omitting the averment of any matter without proving which, the Jury ought not to have given such a verdict.” Now it is. clear, that, in assumpsit, the Jury ought not to find for the plaintiff, unless a promise be proved; and j'et this clause has been construed not to extend to cases in which a promise is not laid in the declaration. If it be proper that the declaration of a plaintiff at law should (notwithstanding the unqualified terms of the act of jeofails) state, in legal form, the ground of controversy, it is certainly equally necessary, that the case exhibited to a Court of Equity should be of a character to confer jurisdiction upon that Court.
There is a strong analogy, then, between these two cases; and as, in a case at law, the Court will not give judgment, (notwithstanding the objection has not been taken,) upon a declaration radically defective, as exhibiting no cause of action'; so although a demurrer (for a plea in this case would be improper) has not been opposed to a bill containing on its face no case for a Court of Equity, but, *on the contrary, the defendant answers tfrereto; yet the Court will not grant relief upon hearing the cause, (f) The necessity of having all averments essential to shew a cause of action, in a declaration at law, and that the case submitted to a Court of Equity should be of a character adapted to that jurisdiction, are land-marks which we ought not to lose sight of, in forming a construction upon the acts in question.
I am therefore warranted in saying, that the act before cited, does not authorise a Court of Equity to decree in a case, as made by the bill, of a purely legal nature.
As to the particular bill before us, it is, on its face, fully adequate; and, if it were supported by the testimony, or if the facts set out in it were admitted by a demurrer, I should see no objection to sustaining it. It charges fraud and concealment, which, if made out by proof, or admitted, would be competent to give a jurisdiction; but there is no demurrer in the case, and the proofs fall short of the charges contained in the bill.
The agreement of September, 1796, closed the previous subject of controversj: the appellant was not bound to state to the ap-pellee what he had done with Morris’s bonds; and the appellee does not state that he made any inquiries on the subject, but, on the contrary, agreed to take Morris’s notes for the amount of the sale. It is not' shewn that these notes were to be payable on demand, and the contrary is rather inferra-ble, from the agreement to “allow interest” thereupon, from the time those given by Morris to Pollard became due.
Pollard, therefore, complied with his *597 agreement, by tendering the notes mentioned in the proceedings; but having, by his answer, made an offer to convey the other 75,000 acres of land, it should oe optional with the appellee to accept the one or the other, in case the land has not been .sold since the offer was made, which was .not then accepted.
I am, therefore, of opinion, that the decree be reversed, and another rendered conformable to the above mentioned ideas.
*JUDGE FLEMING concurred, and said that, on the point of jurisdiction, ■he wished it to be understood that the Judges were unanimous in their opinions that, whenever it appears from the face of the bill, that the matter was not proper for the jurisdiction of a Court of Equity, the bill should be dismissed, notwithstanding the defendant did not plead in abatement.
The opinion of the Court was entered, that the decree of the Chancellor was erroneous in this, “that the defendant, Robert Pollard, was thereby bound to pay to the plaintiff so much money as is equal to the value of the notes of Robert Morris, or of Morris and Nicholson, in Richmond, on the 22d day of September, in the year 1796, which value one of the Commissioners was directed to ascertain and report.” The de-cree was therefore reversed; “and this Court ,proceeding to pronounce such decree as the said Court of Chancery ought to have pronounced: it was further decreed and ordered that, as the said defendant, in his answer of the 11th day of January, 1799, had stated, ‘that he had repeatedly offered to reinstate the former agreement between the parties, and was then willing to convey to the plaintiff the last mentioned tract of 75,000 acres of land, on his returning the money paid him by the defendant;’ the representatives of the said plaintiff (who is now dead) shall have their option either to accept the note dated at Philadelphia, the 5th day of March, 1793, drawn by Robert Morris, in favour of John Nicholson, and indorsed by the said John Nicholson, payable three years afterdate, for four thousand five hundred dollars, and tendered to the said plaintiff, on the 25th day of March, 1797, by John Staples, agent for the said defendant, in full discharge and satisfaction of the said contract of the 2,2d day of September, 1796, or to refund to the said defendant, or to his assigns, the money received of him, in consequence of the said last mentioned agreement, with legal interest thereon from the respective *dates of the receipts thereof, until the same shall be repaid; on the repayment of which, that the said defendant do convey to the representatives of the said plaintiff, David Patterson, deceased, the last mentioned 75,000 acres of land, with a general warranty; unless the said defendant shall have parted with those lands in consequence of the non-acceptance of that offer: and that the representatives of the said David Patterson do, on or before a certain day to be appointed by the Court of Chancery aforesaid, make their election which of the before mentioned alternatives they will abide by and perform ; and, if the .said representatives shall not, on or before the day so to be appointed by the said Court of Chancery, make such election, and pay or tender unto the said Robert Pollard, or to his assigns, the money by him so paid to, or advanced for the said David Patterson, with interest as aforesaid, then the said bill to be dismissed with costs.” And the cause was remanded to the said Court of Chancery, for further proceedings to be had thereon agreeable to the principles of this decree.

 Rev. Code, 1 vol. c. 64, s. 29.

 1 Hen. & Munf. 5.

 1 Hen. & Munf. 18.

 1 Gall, 391.

 Ibid. 664.

 3 Atk. 592.

 1 Hen. & Munf. 321.

 Rev. Code, p. 66, s. 29.

 Mitford, p. 99.

 Ibid. 103, 176.

 Ibid. 178.

 Ibid. 179.

Mitf. 100.